**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BENNETT WILCOSKY, MICHAEL GUNDERSON, and MICHAEL GUNDERSON as next friend of E.G., a minor, each individually, and on behalf of all others similarly situated, | |
| Plaintiffs, | No. 19-cv-05061 |
| v. | Judge Franklin U. Valderrama |
| AMAZON.COM, INC. and AMAZON.COM SERVICES, INC., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Digital assistants are a part of everyday modern life. Based on voice recognition technology, they tell us the weather forecast, play our favorite song, or assist in the preparation of a meal. Digital assistants listen to and respond to users' voice commands.

Bennett Wilcosky (Wilcosky), Michael Gunderson (Gunderson), and Michael Gunderson as next friend of E.G., a minor, (E.G.; collectively, Plaintiffs) sued Amazon.com, Inc. and Amazon.com Services, Inc. (collectively, Defendants or Amazon), individually and on behalf of a putative class of similarly situated individuals the Circuit Court of Cook County, Illinois. Amazon removed the case from the Circuit Court of Cook County to this Court pursuant to the Class Action Fairness

Act (CAFA), 28 U.S.C. § 1332(d)(2). R. 1, Removal Notice.[1] Plaintiffs assert that Amazon's Alexa device, a digital assistant, has recorded and stored their voiceprints—a biometric identifier—without their consent, in violation of the Illinois Biometric Information Privacy Act (BIPA), 740 ILCS 14/1 *et seq*. R. 1-1, Compl.

In response to a Court[2] order, the parties submitted memoranda on whether Plaintiffs have alleged an injury-in-fact sufficient to establish standing under Article III: Plaintiffs argue against standing and request that the Court remand their claims to state court (R. 44, Pls.' Standing Memo.) whereas Defendants argue Article III is satisfied (R. 45, Defs.' Standing Memo.). For the reasons described below, the Court agrees with Defendants that it has subject matter jurisdiction over the case.

Defendants have moved the Court to Compel Arbitration and Dismiss Plaintiffs' Complaint, or in the Alternative, Stay Claims pursuant to Federal Rule of Civil Procedure 12(b)(3).[3] R. 16, Mot. Compel Arb. For the reasons set forth below, the Court grants in part and denies in part Defendants' Motion to Compel Arbitration.

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

[2]This case was previously assigned to Judge Gettleman, who ordered the parties to file briefs addressing Article III standing on February 19, 2020. R. 35. The case was reassigned to Judge Kness on April 27, 2020 (R. 38), who ordered that the parties still file the requested briefs despite the reassignment (R. 43). The case was reassigned to Judge Valderrama on September 28, 2020. R. 54.

[3]Defendants simultaneously moved to dismiss Plaintiffs' claims for lack of personal jurisdiction and for failure to statue a claim. R. 19, Mot. Dismiss. As discussed below, the Court denies the Motion to Dismiss as moot as to Bennett Wilcosky and Michael Gunderson. The Court terminates the Motion to Dismiss without prejudice as to Michael Gunderson as next friend of E.G., a minor, with leave to refile as described below, *see infra* Conclusion.

## Background

Amazon operates the "Alexa" voice based virtual assistant.[4] Compl. ¶ 1. Alexa listens to users, records users' voices, and responds to the users' voice commands using speech and voice recognition technology. *Id*. ¶ 4. Alexa uses the users' voice recordings to answer the users' questions and fulfills the users' requests. *Id*. Amazon offers Alexa services through several means, including Amazon's Echo Smart speakers and Fire tablets, as well as various third-party devices. *Id*. ¶ 3. Amazon retains every voice recording created by the user and any individual who happens to be speaking near the Alexa device. *Id*. ¶ 6. The Alexa device transmits all oral communications it records to Amazon's servers. *Id*. ¶ 28. Amazon then indefinitely stores copies of all recordings on its own servers for continued use and analysis. *Id*.

Amazon does not inform Alexa users in writing that Alexa is collecting biometric information or biometric identifiers. Compl. ¶ 29. Nor does Amazon inform bystanders—people who speak in the vicinity of Alexa devices but do not own Alexa devices or have Alexa accounts—in writing that Alexa is collecting biometric information or biometric identifiers. *Id*. ¶ 30.

Amazon provides its products and services, including Alexa, to users subject to Amazon's Conditions of Use (COUs). R. 17-1, Buckley Decl. ¶ 3. A user must accept Amazon's COUs in order to purchase products and services from or through Amazon, including purchasing an Alexa-capable device and/or registering an Alexa account.

---

[4]The following recitation of facts is excerpted from Plaintiffs' Complaint (R. 1-1) and such facts are deemed to be true for the purposes of this motion. *See Bell v. City of Chi*., 835 F.3d 736, 738 (7th Cir. 2016); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

*Id.* No individual can be an Amazon user, including using Alexa, without first agreeing to Amazon's COUs. *Id.* At the checkout page, a customer is asked to review and confirm their order by clicking a "Place your order button." *Id.* ¶ 4. The check-out page states: "By placing your order, you agree to Amazon.com's <u>privacy notice,</u> <u>conditions of use</u> and all of the terms found <u>here</u>."[5] *Id.*

Since August 2011, Amazon's COUs have included an arbitration agreement with a class action waiver provision. Buckley Decl. ¶ 7. The arbitration provision in effect in 2014 provides, in part: "Any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court … ." *Id.*

In addition to Amazon COUs, Amazon has Alexa Terms of Use (TOUs), for users of Alexa. Buckley Decl. ¶ 11. To set up an Alexa device, the user is prompted either to sign into his or her Amazon account or create a new account. *Id.* When signing in, the user is notified that by continuing in the process of activating Alexa, the user agrees to Alexa's TOUs, which are hyperlinked. *Id.*

Section 3.6 of Alexa's TOUs in effect on June 25, 2015, provided:

> **Disputes/Binding Arbitration**. Any dispute or claim arising from or relating to this Agreement or Alexa is subject to the binding arbitration, governing law, disclaimer of warranties, limitation of liability, and all other terms in the Amazon.com Conditions of Use. By using Alexa, you agree to be bound by those terms.

Buckley Decl. ¶ 15 (citing *id.*, Exh. F, 2018 TOUs § 3.6; *id.*, Exh. H, 2019 TOUs § 3.6).

---

[5]On Amazon's website, the underlined text provides a hyperlink to the full COUs. Buckley Decl. ¶ 4.

Wilcosky alleges that as of June 25, 2019, he had not and never had been a purchaser of any Alexa device, nor had he ever set up an Alexa account or downloaded the Alexa application. Compl. ¶ 36. Nevertheless, Wilcosky claims that his voice has been recorded without his consent by Alexa devices in Illinois numerous times. *Id.* ¶ 37. When Wilcosky spoke in proximity to an Alexa device while the Alexa device was recording, Amazon recorded and stored Wilcosky's voice in its databases and on its servers. ¶ 38.

Gunderson owns an Amazon Echo equipped with Alexa services. Compl. ¶ 46. Gunderson also claims that his voice has been recorded without his consent by Alexa devices in Illinois numerous times. *Id.* ¶ 47. Gunderson alleges that when he spoke in proximity to an Alexa device while the Alexa device was recording, Alexa recorded and stored Gunderson's voice in its databases and on its servers, without his consent. ¶¶ 48, 50.

E.G. is a minor who resides with her father, Gunderson. Compl. ¶ 55. E.G.'s voice has been recorded by Alexa devices on several occasions without her consent. *Id.* ¶ 56. When E.G. spoke in proximity to an Alexa device while the Alexa device was recording, Amazon recorded and stored E.G.'s voice in its databases and on its servers, without the consent or authorization of E.G.'s legally authorized representative. *Id.* ¶¶ 57, 60.

Plaintiffs filed suit against Defendants for violating BIPA, 740 ILCS 14/1 *et seq*. In their first cause of action, Plaintiffs allege that Amazon, through its "Alexa" voice-based virtual assistant, captured, collected, and stored their biometric

5

identifiers (their voiceprints) without their consent and without providing Plaintiffs written disclosures about the collection and storage of their voiceprints, in violation of 740 ILCS 14/15(b). Compl. ¶¶ 70–75. In their second cause of action, Plaintiffs claim that Defendants failed to publicly provide a retention schedule or guidelines for permanently destroying the biometric identifiers or biometric information as required under 740 ILCS 14/15(a). *Id.* ¶¶ 78–79. Defendants, in turn, have moved to compel arbitration of and to dismiss Plaintiffs' Complaint or in the alternative, to stay Plaintiffs' claims, pursuant to Federal Rule of Civil Procedure 12(b)(3). Mot. Compel Arb. at 1.

## Legal Standard

### I.    Standing

The party who invokes jurisdiction bears the burden of establishing that Article III standing exists. *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 620 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (June 30, 2020) (citing *Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir. 2018) (*per curiam*)). For cases removed under traditional diversity jurisdiction, 28 U.S.C. § 1332(a), federal courts interpret the removal statute narrowly and "resolv[e] any doubt in favor of the plaintiff's choice of forum in state court." *McGinnis v. United States Cold Storage, Inc.*, 2019 WL 7049921, at *2 (N.D. Ill. Dec. 23, 2019) (citation omitted). But for cases removed under CAFA—like this one—there is no presumption against removal." *Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 578 n.22 (7th Cir. 2017)

For a party to have "Article III standing, three requirements must be satisfied: (1) she must have suffered an actual or imminent, concrete and particularized injury-in-fact; (2) there must be a causal connection between her injury and the conduct complained of; and (3) there must be a likelihood that this injury will be redressed by a favorable decision." *Bryant*, 958 F.3d at 620–21 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded." 28 U.S.C. § 1447(c) (emphasis added).

## II. Arbitration

A case may be also dismissed for lack of proper venue. FED. R. CIV. P. 12(b)(3). A motion to dismiss "based on a contractual arbitration clause is appropriately 'conceptualized as an objection to venue, and hence properly raised under Rule 12(b)(3).'" *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 807 (7th Cir. 2011) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007)). Dismissal is appropriate when the forum selection clause of a contract requires arbitration in another district. *HTG Cap. Partners, LLC v. Doe*, 2016 WL 612861, at *8 (N.D. Ill. Feb. 16, 2016) (citing *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005)). The plaintiff bears the burden of establishing that venue is proper. *Rotec Indus., Inc. v. Aecon Grp., Inc.*, 436 F. Supp. 2d 931, 933 (N.D. Ill. 2006). Under Rule 12(b)(3), the court is "not obligated to limit its consideration to the pleadings nor to convert the motion to one for summary judgment." *Nagel*, 995 F. Supp. at 843 (a court may examine facts

outside the complaint to determine whether venue is proper); *see also Cont'l Cas. Co.*, 417 F.3d at 733. The court must resolve factual conflicts in the parties' submissions and draw any reasonable inferences in the plaintiffs' favor, unless they are contradicted by the defendants' affidavits. *Miller*, 2018 WL 4030590, at * 4 (citing Nagel, 995 F. Supp. At 843).

The Federal Arbitration Act (FAA) "reflects both a liberal federal policy favoring arbitration . . . and the fundamental principle that arbitration is a matter of contract." *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). Under the FAA, arbitration agreements "'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 740 (7th Cir. 2010) (quoting 9 U.S.C. § 2). "Although it is often said that there is a federal policy in favor of arbitration, federal law places arbitration clauses on equal footing with other contracts, not above them." *Id.*

The party seeking to compel arbitration has the burden of establishing an agreement to arbitrate. 9 U.S.C. § 4; *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). Once the party seeking to compel has done so, the party resisting arbitration bears the burden of identifying a triable issue of fact on the purported arbitration agreement. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The resisting party's evidentiary burden is like that of a party opposing summary judgment. *Id.* "[A] party cannot avoid compelled arbitration by generally denying the

facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id*. Like summary judgment, the court views the evidence in the light most favorable to the non-moving party and draws reasonable inferences in its favor. *Id*. If the party opposing arbitration identifies a genuine issue of fact as to whether an arbitration agreement was formed, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4; *see Tinder*, 305 F.3d at 735.

"[A]rbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017). Plaintiffs do not dispute that the third element is met here, as they refuse to arbitrate their claims with Defendants. What the parties dispute are the first and second elements, as Plaintiffs deny (1) the existence of a valid written arbitration agreement between Plaintiffs and Amazon, and (2) that the dispute falls within the scope of any purported arbitration agreement.

## Analysis

The Illinois legislature passed BIPA in 2008 to regulate "the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g); *see also Liu v. Four Seasons Hotel, Ltd.*, 138 N.E.3d 201, 204 (Ill. App. Ct. 2019). "Biometric identifier" includes, among other things, a voiceprint. 740 ILCS 14/10. "'Biometric information' means any information, regardless of how it is captured, converted, stored, or shared based on an individual's

biometric identifier used to identify an individual." *Id.* Biometric information is particularly sensitive because unlike social security numbers, which can be changed if necessary, biometric identifiers cannot be changed. *Id.* § 14/5(c). BIPA provides "robust protections for the biometric information of Illinois residents." *Thornley v. Clearview AI, Inc.,* 2021 WL 128170, at *1 (7th Cir. Jan. 14, 2021).

Section 14/15(a) of BIPA requires private entities that possess biometric information to develop a publicly available written policy that includes a retention schedule and destruction guidelines. Under Section 14/15(b), private entities must (1) inform the individual whose biometric information is being collected, that it is being collected or stored; (2) inform the individual "in writing of the specific purpose and length of term for which [the biometrics are] being collected, stored, and used;" and 3) receive a written release from the person. *Bryant*, 958 F.3d 617 at 619.

Here, Plaintiffs allege that the Defendants violated (1) Section 15(b) of BIPA by failing to properly inform Plaintiffs in writing that their voiceprints were being collected and stored and by failing to obtain Plaintiffs' written release prior to any such collection, use, or storage (Compl. ¶¶ 73–74); and (2) Section 15(a) of BIPA by failing to maintain a publicly available "retention schedule or guidelines for permanently destroying" Plaintiffs' biometrics as required by BIPA. (*Id.* ¶ 79).

Plaintiffs argue that this case should be remanded to state court because the Complaint does not allege an injury-in-fact under Section 15(a), and therefore all claims should be remanded for purposes of efficiency and consistency. Pls.' Standing Memo. at 2. On the other hand, Defendants argue that Plaintiffs have alleged an

injury-in-fact sufficient to establish standing under Article III over both their Section 15(b) and Section 15(a) claims. Defs.' Standing Memo. at 1. The Court agrees with Defendants and finds that both BIPA violations alleged in the complaint rise to the level of a concrete and particularized injury for purposes of Article III standing.

Defendants argue that, even though this Court has subject matter jurisdiction over its claims such that the case should not be remanded to state court, in light of the arbitration provisions in Amazon's COUs and Alexa's TOUs, the case belongs in arbitration, not in court. *See* R. 17, Memo. Compel. The Court agrees that Wilcosky and Gunderson's claims are subject to arbitration and grants Defendants' Motion to Compel Arbitration as to those two plaintiffs. However, it denies without prejudice the Motion to Compel Arbitration as to E.G.'s claims and directs the parties to file supplemental briefs addressing the equitable estoppel argument under Illinois law.

The Court addresses the jurisdictional issue of Article III standing before reviewing the merits of Defendants' Motion to Compel Arbitration.

## I. Standing

Only the first element of Article III standing is at issue here: whether Plaintiffs' suffered an injury in fact. The injury in fact inquiry "asks whether the plaintiff has suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1151–52 (7th Cir. 2020) (internal citations and quotations omitted). An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Id.* (quoting *Lujan*, 504 U.S. 555 at 560

n.1). "A generalized grievance shared by all members of the public will not suffice." *Id.* (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342–44 (2006)).

### A. Section 15(b)

Plaintiffs do not dispute that their Section 15(b) claim—that Amazon failed to properly inform Plaintiffs in writing that their voiceprints were being collected and stored and failed to obtain Plaintiffs' written release prior to any such collection, use, or storage (Compl. ¶¶ 73–74)—sufficiently alleges an injury in fact. Pls.' Standing Memo. at 2 (citing *Bryant*, 958 F.3d at 617). The Court agrees that the law in the Seventh Circuit regarding BIPA Section 15(b) claims is clear after *Bryant*: "failure to follow section 15(b) of the law leads to an invasion of personal rights that is both concrete and particularized" that meets the criteria for Article III standing. *Bryant*, 958 F.3d at 619. Therefore, by alleging that Defendants failed to make the required disclosures and failed to obtain Plaintiffs' informed written consent before collecting their biometric data (*see* Compl. ¶¶ 13, 28–34, 40–41, 50–51, 59–60, 73–74), Plaintiffs sufficiently pled the "concrete injury BIPA intended to protect against, *i.e.* a consumer's loss of the power and ability to make informed decisions about the collection, storage, and use of her biometric information." *Bryant*, 958 F.3d at 627. Plaintiffs have standing to pursue their Section 15(b) claims in federal court.

### B. Section 15(a)

The parties dispute whether Plaintiffs have standing for their Section 15(a) claim. The Seventh Circuit recently clarified when an alleged violation under Section 15(a) sufficiently alleges an injury in fact under Article III. In *Fox*, the Seventh

Circuit reversed and remanded the district court's remand of the plaintiff's Section 15(a) claim to state court because "[u]nlike in *Bryant*, [plaintiff's] Section 15(a) claim does not allege a mere procedural failure to publicly disclose a data-retention policy" but rather alleges:

> a concrete and particularized invasion of her privacy interest in her biometric data stemming from [defendant's] violation of the full panoply of its section 15(a) duties—the duties to develop, publicly disclose, *and comply with* data retention and destruction policies—resulting in the wrongful retention of her biometric data after her employment ended, beyond the time authorized by law.

980 F.3d at 1149.

Similarly to the plaintiff in *Fox*, here Plaintiffs allege not only that Amazon fails to publish a retention and destruction schedule, but also that Amazon continues to retain, use, and analyze their biometrics indefinitely. Compl. ¶¶ 4, 6, 9–10, 28, 35, 44, 49–50, 53, 57–58, 62. As the Seventh Circuit held, "an unlawful *retention* of a person's biometric data is as concrete and particularized an injury as an unlawful *collection* of a person's biometric data." *Fox*, 980 F.3d at 1155.

Plaintiffs argue only summarily that the Court does not have jurisdiction to hear the merits of their Section 15(a) claims. Pls.' Standing Memo. at 2. They cite only two cases in support of this argument, one in their initial memorandum (*id.* citing *Bryant*, 958 F.3d at 626), and another in a notice of supplemental authority (R. 58 citing *Thornley*, 2021 WL 128170, at *1). Neither *Bryant* nor *Thornley* support Plaintiffs' position. As Defendants note in their own notice of supplemental authority, after the filing of Plaintiffs' memorandum, the Seventh Circuit amended its opinion in *Bryant*, explaining that the plaintiff lacked standing to pursue her Section 15(a)

13

claim because she alleged only a violation of the provision of Section 15(a) that requires publishing a written retention schedule and guidelines for destroying biometric identifiers. R. 52 at 2 (citing *Bryant*, 958 F.3d at 626). The Court offered Plaintiffs an opportunity to file a response regarding the effect of the supplemental authority cited by Defendants (R. 53), but Plaintiffs did not do so. And as discussed above, the Seventh Circuit has subsequently clarified that a plaintiff sufficiently alleges an injury in fact under Section 15(a) if she alleges that the defendant unlawfully retained her biometric data, *Fox*, 980 F.3d at 1155, as Plaintiffs have alleged in their Complaint.

*Thornley* does not change the analysis either. In that case, the plaintiffs— seeking to avoid removal—were careful to allege *only* a bare procedural violation, stating that they "suffered no injury from Defendants' violation of Section 15(c) of BIPA other than statutory aggrievement." *Thornley*, 2021 WL 128170, at *5 (citing complaint ¶ 38). The Seventh Circuit, in affirming the district court's remand order, agreed with the district court that "a plaintiff is the master of her own complaint" and because the plaintiffs were careful to allege only a general, regulatory violation, they did not have Article III standing to pursue the claims in federal court. *Id.* at *5, *7. That is not the case here: Plaintiffs alleged that Amazon unlawfully retained all of their biometric data in violation of Section 15(a), which is sufficiently particularized to satisfy Article III. *Thornley*, 2021 WL 128170, at *4 ("We thus held that 'an unlawful *retention* of a person's biometric data is as concrete and particularized an injury as an unlawful *collection* of a person's biometric data.'")

14

(quoting *Fox*, 980 F.3d at 1155). Therefore, the Court also possesses Article III standing over Plaintiffs' Section 15(a) claim.

## II. Arbitration

Because this Court has subject matter jurisdiction over Plaintiffs' claims, it can now proceed to address the merits of the case, including Defendants' Motion to Compel Arbitration. It begins with the two adult Plaintiffs, Wilcosky and Gunderson.

### A. Wilcosky and Gunderson

### 1. Existence of a Valid Arbitration Agreement

The threshold issue before the Court is whether a valid arbitration agreement exists between the parties. In determining whether a valid arbitration agreement exists between parties, federal courts apply the state law principles of contract formation. *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F. 3d 705, 711 (7th Cir. 2019). Here, Amazon's COUs include a choice-of-law provision electing Washington state law. Buckley Decl. ¶ 8 (citing *id.*, Exh. A, 2018 COUs). Plaintiffs, on the other hand, assert that Illinois law applies. R. 29, Resp. at 3 n.1 (citing Compl. *generally*). Yet, neither party substantively addresses the choice-of-law issue in their briefs, but rather relegates the issue to footnotes. *Id.*; Memo. Compel at 7 n.5. The Court, though, has not found any differences between Washington law and Illinois law regarding contract formation principles. Indeed, Defendants state as much. Memo. Compel at 7 n.5 (citing *Barron v. Ford Motor Co. of Canada*, 965 F.2d 195, 197 (7th Cir. 1992)). Nor do the parties challenge application of Illinois law, as the forum state, to resolve

this dispute. Therefore, the Court applies Illinois law notwithstanding the choice-of-law provision in Amazon's COUs.

An enforceable contract under Illinois law requires an offer, acceptance, consideration, and mutual assent. *Nat'l Prod. Workers Union Ins. Trust v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011). Although arbitration agreements are subject to generally applicable contract defenses, Plaintiffs do not contend that Amazon's arbitration provision was procured by fraud, executed under duress, or is unconscionable. Instead, Plaintiffs argue that Amazon has failed to meet its burden of showing a valid agreement to arbitrate between Wilcosky and Amazon, on the one hand, and Gunderson and Amazon, on the other hand. Resp. at 8–15. Their argument rests on the claim that Amazon has failed to establish a prima facie case that it made a contract offer to them. *Id.* at 9.

Amazon's COUs contain an arbitration agreement that is written in English and placed under a bold and capitalized heading "Disputes," with key provisions in bold font. Buckley Decl. ¶ 7; *id.*, Exh. A, 2018 COUs; *id.*, Exh. B, 2012 COUs.[6] The arbitration agreement also provides instructions regarding how to commence arbitration. 2018 COUs. The agreement provides that the arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes (AAA Rules),

---

[6] Defendants attach two versions of Amazon's COUs to Buckley's declaration, one updated on May 21, 2018 (2018 COUs) and one updated on December 5, 2012 (2012 COUs). Because the "Disputes" sections in the two COUs are identical, the Court cites only to the 2018 COUs in this Opinion unless otherwise specified. Similarly, six versions of Alexa's TOUs are attached to Buckley's declaration, but the Court cites only to the 2019 version. *See* Buckley Decl. Exhs. C–H.

and provides the AAA's website and phone number. *Id.* As noted above, Alexa's TOUs contain a bolded section titled "Disputes/Binding Arbitration" which states that any dispute or claim arising out of the Agreement is subject to all terms in the COUs and contains a hyperlink to the COUs. Buckley Decl. Exh. H, 2019 TOUs, § 3.6. Plaintiffs do not challenge the existence or validity of the arbitration agreement. Instead, Plaintiffs maintain that they did not consent to the arbitration agreement through either the COUs or the TOUs.

Wilcosky[7] maintains that he never purchased a device containing the Alexa voice assistant, and he never installed the Amazon Alexa application on a smartphone. R. 29-1, Wilcosky Decl. ¶¶ 4–5. Wilcosky asserts that Amazon never presented him with any contract that includes an arbitration agreement, nor has Wilcosky seen any such contract. Wilcosky Dec. ¶¶ 6–7. Indeed, notes Wilcosky, Amazon concedes that it has no record of Wilcosky installing the Alexa application on any device. Resp. 9–10 (citing R. 29-3, Amazon Resp. RFP Nos. 2–4; R. 29-4, Amazon Prod. 1–8.) Wilcosky argues that as a result, Amazon has not met its burden of showing offer, acceptance, and consideration as to the COUs or the TOUs. Resp. at 10. Although he adopts Wilcosky's arguments, Gunderson does not submit a declaration in support of his Response, and therefore he does not deny on the record that he was presented with an arbitration agreement via the COUs or TOUs.

---

[7]Gunderson makes the same arguments advanced by Wilcosky. Resp. at 15 ("For the reasons articulated for Wilcosky … above, Amazon has similarly failed to show it presented a contract containing an arbitration clause to Plaintiff Gunderson.").

17

### a. Conditions of Use

Although Plaintiffs insist that they did not assent to the COUs, the evidence belies that contention. In support of their Motion, Defendants submit the Declaration of Brian Buckley, Associate General Counsel at Amazon.com. Buckley attests that Amazon provides its products and services, including Alexa, to users subject to Amazon's COUs. Buckley Decl. ¶ 3. A user must accept Amazon's COUs in order to purchase products and services from or through Amazon, including but not limited to purchasing an Alexa-capable device and/or registering an Alexa account.[8] *Id.* When determining whether an individual assented to an online rather than physical contract, a court must "look more closely at both the law and to the facts to see if a reasonable person in [the customer's] shoes would have realized that he was assenting to the [contract]." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016).

Amazon.com's standard check-out page contains a notice that states, "By placing your order, you agree to Amazon.com's <u>privacy notice</u> and <u>conditions of use</u>." Wilcosky Decl. Exh. C, Amazon Prod. at 1–3; Buckley Decl. ¶ 4. Depending on whether the purchase is made in a browser or through Amazon's shopping application, the notice is located directly above or directly below the "Place your

---

[8] Buckley also states that "[n]o individual can be an Amazon customer, including Amazon's Alexa service, without first agreeing to Amazon's COUs." Buckley Decl. ¶ 3. But Amazon fails to produce any evidence—through Buckley's declaration or otherwise—demonstrating how the COUs are provided to customers at the time they sign up with Amazon or at any time apart from when they make purchases or sign up for Amazon's Alexa services. So the Court cannot find that *all* Amazon customers have notice of the COUs such that a contract is formed unless the customer makes a purchase or registers an Alexa device.

order" button, such that it is clearly visible when viewing the page. Amazon Prod. at 1–3; Amazon Resp. RFP No. 5; Buckley Decl. ¶ 4. The text is somewhat smaller than other text on the page, but the hyperlink to the COUs is set off in blue-colored font. Amazon Prod. at 1–3; Buckley Decl. ¶ 4.

As Amazon points out in its Motion, courts in other Districts have enforced Amazon's arbitration agreement under Washington law based on customers' acceptance of the COUs when placing orders. Memo. Compel Arb. at 10–11 (citing, among other cases, *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1069 (S.D. Cal. 2015), *aff'd sub nom. Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862 (9th Cir. 2017) (enforcing Amazon's arbitration agreement with customers under Washington law, where standard check-out page notified customer that by placing order, customer agreed to Amazon's COUs, which were hyperlinked and set off in blue font); *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1173–74, 1178 (W.D. Wash. 2014) (enforcing Amazon's arbitration agreement with customers under Washington law, where plaintiffs agreed to hyperlinked COUs when renewing Prime membership and making purchases)). And courts in this District applying Illinois law have also enforced arbitration agreements where customers were provided with similar online notices. *See Gorny v. Wayfair Inc.*, 2019 WL 2409595, at *6 (N.D. Ill. June 7, 2019), *appeal dismissed,* No. 19-2276, 2019 WL 7486843 (7th Cir. July 30, 2019) (enforcing arbitration agreement under Illinois law where plaintiff agreed to hyperlinked terms of use containing arbitration agreement when clicking on a "Place Your Order" button); *c.f. Wilson v. Redbox Automated Retail, LLC,* 448 F. Supp. 3d

873, 883 (N.D. Ill. 2020) (noting that "[n]ormally, courts will find a sufficient spatial connection where a consumer has an opportunity to review the terms and conditions in the form of a hyperlink placed directly adjacent to the button by which the consumer manifests assent" but holding that too many buttons separated the "Pay Now" button and link to the Terms of Use for the plaintiff to have sufficient notice).

Buckley states that Wilcosky created an Amazon account in January 14, 2014 and made a purchase with his account as recently as August 23, 2019. Buckley Decl. ¶ 5. Similarly, Buckley attests that Gunderson created an Amazon account on November 9, 1998 and made a purchase with his account as recently as August 22, 2019. *Id.* ¶ 6. Notably, Wilcosky does not challenge Buckley's assertion that he bought items from Amazon's website. Nor does Wilcosky deny that he created an Amazon account. Instead, Wilcosky more generally states that "Amazon has never presented [him] with any contract that includes an arbitration agreement" and that he has "never seen a contract of any kind between Amazon and [him] containing an arbitration agreement." Wilcosky Decl. ¶¶ 6–7. His denials that he has neither "seen" nor been "presented with" an arbitration agreement are insufficiently specific to demonstrate a material factual dispute for trial. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002); *Gorny*, 2019 WL 2409595, at *6 (rejecting plaintiff's arguments that he never "saw" the terms of use where evidence showed that he clicked a "Place Your Order" button with a notice of agreement to terms of use immediately below the button). Gunderson presents no evidence to contradict Buckley's statement about his purchases either. Therefore, the Court finds that as a

result of their purchases from Amazon, both Wilcosky and Gunderson agreed to the COUs such that a contract was formed.

### b. Terms of Use

In addition to agreeing to the COUs to set up an Alexa device, an Alexa user also must agree to the TOUs. Buckley Decl. ¶ 11. The COUs provide that the user also will be subject to the guidelines, terms, agreements applicable to the specific Amazon Services used (Service Terms). 2018 COUs. For Alexa services, those Service Terms are the publicly available TOUs. *See* Buckley Decl. ¶ 11.

The Court begins with Gunderson, because he indisputably agreed to the TOUs. He activated his Alexa services on November 23, 2015 and registered approximately twenty-three devices with Alexa. Buckley Decl. ¶¶ 13–14; R. 29-2, Amazon Ans. Interrog. No. 3 (including, among others, in the list of device names belonging to Gunderson, "Michael's Amazon Alexa on iOS and "Michael's Echo"); *see also* Compl. ¶ 46 ("Plaintiff Michael Gunderson owns an Amazon Echo equipped with Alexa services."). Amazon's document production includes screenshots of the sign-in screen for the Alexa app on the iOS operating system for iPhones, as well as the welcome screen when signing into an Alexa mobile app for the first time. Amazon Resp. RFP No. 10; Amazon Prod. at 4–5. On the welcome screen, directly above a "Continue" button appears the sentence, "By tapping 'Continue,' you agree to Amazon's Conditions of Use and all the terms found here." *Id.* The "all the terms found here" hyperlink (in blue) leads to a webpage that includes a hyperlink to "Alexa Terms of Use" at the top of the page. Amazon Prod. at 7. Like Gunderson's consent to

the COUs when clicking the "Place your order button" when making a purchase on Amazon.com, he also consented to the Alexa TOUs by clicking "Continue" on the Alexa iOS app. *See also Miracle-Pond v. Shutterfly, Inc.*, 2020 WL 2513099, at *4 (N.D. Ill. May 15, 2020). Gunderson therefore agreed to the TOUs.

On the other hand, Wilcosky insists that he never purchased a device containing the Alexa voice assistant or installed the Alexa application on a smartphone (Wilcosky Decl. ¶¶ 4–5)—and Amazon does not present evidence to the contrary (*see* R. 31, Reply at 6–7; Amazon Ans. Interrog. No. 5 ("Amazon … has no record of Plaintiff Wilcosky installing the Alexa app on any device."). However, Amazon argues that there are other ways to assent to the TOUs. Reply at 6–7; Amazon Ans. Interrog. No. 2. Given Wilcosky's uncontroverted denials, the only way that he could have agreed to the TOUs was by downloading and registering Amazon apps that are embedded with the Alexa service, such as the Amazon Music or Shopping apps. *Id.* Amazon argues that its "business records reflect exactly that." Reply at 7 (citing Buckely Decl. ¶ 12). But Buckley states only that Wilcosky "registered four Android devices with Alexa." Buckley Decl. ¶ 12. Nowhere in his declaration does he state that Wilcosky downloaded or registered Amazon app. Amazon's answer to Wilcosky's Interrogatory asking Amazon to describe "the process for viewing and assenting to Amazon's Alexa TOUs on each of [Wilcosky's registered] devices" is similarly vague, describing multiples ways that a customer can view and assent to the TOUs of an Android device, but failing to identify which way Wilcosky so assented. Amazon Ans. Interrog. No. 5. Amazon has not provided enough facts for

this Court to determine whether "a reasonable person in [Wilcosky's] shoes would have realized that he was assenting to the [TOUs]." *Sgouros*, 817 F.3d at 1035.

Even if the Court found that Amazon had presented evidence that Wilcosky downloaded and registered an Amazon app embedded with the Alexa service, Amazon still fails to establish that Wilcosky had reasonable notice of the terms of the contract. According to Amazon's Interrogatory answer, within the Amazon Music app, "[i]n the lower right hand corner of the home screen is an icon labeled 'Alexa.' When a user clicks that icon, the user is notified that by using the Alexa service on the Amazon Music app, he or she agrees to Amazon's COUs and all the terms found 'here,' both of which are hyperlinked. … The all the terms found 'here' language in the disclosure on the welcome screen above is a hyperlink that, when tapped, directs the user to a screen listing all the additional service terms that apply to the Alexa service, including the Alexa TOUs." Amazon Ans. Interrog. No. 2. This kind of online contract is a "browsewrap agreement," which typically involves "a situation where notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink." *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011) (internal citations omitted). Because a browsewrap agreement requires no affirmative action "by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id.* Amazon has presented no evidence that Wilcosky

ever clicked on the Alexa app in the "corner of the home screen." If not, he never would have seen the hyperlink to the TOUs. Therefore, the Court cannot find that Wilcosky had constructive notice that he was assenting to the TOUs based on the fact that he "registered four Android devices with Alexa."

However, even though Wilcosky did not agree to the TOUs, the Court agrees with Amazon that "his BIPA claims [are] still [] subject to arbitration because he assented to the Amazon COUs when making purchases using Amazon's website." Reply at 5. Therefore, the Court finds that Plaintiffs Wilcosky and Gunderson assented to be bound to the terms of the COUs, which includes the arbitration agreement and class action waiver provision (and Gunderson also assented to be bound to the terms of the TOUs, which includes the same arbitration agreement through reference to the COUs). The Court having found the existence of a valid arbitration agreement, now turns to whether Plaintiffs' claims are within the scope of the arbitration agreement.

## 2. Scope of Arbitration Agreement

Once the court finds that there is a valid agreement to arbitrate, the burden shifts to the party opposing arbitration to show that the dispute is not covered by the agreement. *Hoenig v. Karl Knauz Motors.,* 983 F. Supp. 2d 952, 962 (N.D. Ill. 2013) (citing *Shearson/Am. Express, Inc., McMahon*, 482 U.S. 220, 226–27 (1987)).

At the outset, the Court must point out that while Amazon's initial argument as to scope is that whether Plaintiffs' claims fall within the scope of the arbitration agreement is an issue for the arbitrator to decide, Plaintiffs fail to address this

argument, much less rebut it in their response.[9] Defendants argue that the absence of any response is a concession of the argument. Reply at 3 n.2. The Court agrees. Plaintiffs' silence on this point can only be construed as a concession that whether their claims fall within the scope of the arbitration agreement is an issue for the arbitrator to decide. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver.") Therefore, the Court finds that Plaintiffs concede this point.

Nonetheless, even if Plaintiffs had addressed this point, the Court finds that whether Plaintiffs' claims fall within the scope of the arbitration agreement is an issue for the arbitrator to decide. *See Ali v. Vehi-Ship*, 2017 WL 5890876, at *7 (N.D. Ill. Nov. 27, 2017). In *Ali*, the court explained:

> Usually it is for courts to decide gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy. In other words, questions of arbitrability are generally for courts to decide (citations omitted). But the general rule is displaced when there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. Gateway arbitrability issues can be committed to an arbitrator through a delegation clause. A delegation clause is simply an additional, antecedent agreement to arbitrate threshold issues.

*Id.* at *3 (internal citations and quotations omitted).

Here, the COUs incorporate the AAA Rules. 2019 COUs. Those rules provide in part that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the

---

[9]Instead, Plaintiffs' argument centers on the fact that their BIPA claims have no relation to the contract in which the arbitration provision appears, and therefore the provision cannot be enforced. Resp. at 11–14.

arbitration agreement or to the arbitrability of any claim or counterclaim." Rule 14, AAA Rules, available at http://www.adr.org/sites/default/files/Consumer%20Rules.pdf (last accessed Feb. 2, 2021). "Although the Seventh Circuit has not specifically addressed whether a delegation clause can be incorporated by reference, it long ago held that an 'agreement of the parties to have any arbitration governed by the rules of the AAA incorporate[s] those rules into the agreement.'" *Ali*, 2017 WL 5890876, at *3 (quoting *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1272 (7th Cir. 1976)). Moreover, as noted by *Ali*, "the consensus view of federal case law is that the incorporation by reference of the AAA Rules is clear and unmistakable evidence of an intention to arbitrate arbitrability." 2017 WL 5890876, at *9. Because the AAA Rules were incorporated by reference in the COUs, the parties delegated to the arbitrator the power to arbitrate the scope of the arbitration agreement.[10]

## B. E.G.

Defendants argue that Plaintiff E.G., a minor, while not a signatory herself to the arbitration agreement, is bound by her legal representative's consent to arbitration and must be compelled to arbitrate for three reasons: First, E.G. must

---

[10]In addition to *Ali*, numerous other courts in this Circuit have adopted the incorporation by reference view of the AAA Rules. *See Crooms v. Southwest Airlines Co.*, 459 F. Supp. 3d 1041, 1055–56 (N.D. Ill. 2020); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2020 WL 832365, at *5 (N.D. Ill. Feb. 20, 2020); *Allscripts Healthcare, LLC v. Extransmedia Tech., Inc.*, 188 F. Supp. 3d 696, 701 (N. D. Ill. 2016); *Cequent Performance Prods., Inc. v. Let's Go Aero, Inc.,* 2016 WL 4036754, *25 (N.D. Ill. July 28, 2016); *Wal-Mart Stores, Inc., v. Helferich Pat. Licensing, LLC*, 51 F. Supp. 3d 713, 719–20 (N.D. Ill. 2014); *Corrigan v. Domestic Linen Supply Co.*, 2012 WL 2977262, at*6 (N.D. Ill. July 20, 2012); *Yellow Cab Affiliation, Inc., v. N.H. Ins., Co.*, 2011 WL 307617, at *14 (N.D. Ill. Jan. 28, 2011). *But see Taylor v. Samsung Elecs. Am., Inc.*, 2020 WL 1248655, at *4–5 (N.D. Ill. Mar. 16, 2020) (rejecting adoption by incorporation view).

arbitrate her claims under principles of equitable estoppel. Memo to Compel Arb. at 8. Second, where claims are based on the same set of facts and inherently separable, the court may order arbitration of claims against the party even if that party is not a party to the arbitration agreement. *Id.* at 8–9. Third, E.G. is bound to arbitrate under agency principles. *Id.* at 9–10. Defendants note that arbitration agreements may encompass non-signatories under equity, and contract and agency principles. *Id.* at 8–10 (citing *Romney v. Franciscan Med. Grp.*, 349 P.3d 32 (Wash. App. Ct. 2015); *Townsend v. Quadrant Corp.*, 268 P.3d 917 (Wash. 2012)). Plaintiffs argue that none of these exceptions apply to E.G. Resp. at 4–8. The Court addresses each argument in turn.

### 1. Equitable Estoppel

As a threshold matter, the Court addresses the parties' reliance exclusively on out-of-state law (and primarily Washington law) in addressing Amazon's argument that non-signatory E.G. is bound by the principle of equitable estoppel to arbitrate her claims.[11] As noted above, the parties dispute—without much substantive argument—whether Washington or Illinois law applies to the validity of the

---

[11]Defendants briefs: Memo. Compel Arb. at 8 (citing *Townsend*, 268 P.3d 917 (Washington law)); Reply at 7–9 (citing *Univera, Inc. v. Terhune*, 2009 WL 3877558, at *2 (W.D. Wash. Nov. 18, 2009) (Washington law); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014) (New York law); *Hofer v. Emley*, 2019 WL 4575389, at *6–8 (N.D. Cal. Sept. 20, 2019) (California law)); R. 46, First Suppl. Author. (citing *Tice v. Amazon.com, Inc.*, 2020 WL 1625782, at *2 (C.D. Cal. Mar. 25, 2020) (California law)); R. 50, Sec. Suppl. Author. (citing Amazon.com Alexa Cases, Judicial Council Coordinated Proceeding No. JCCP 5069 on July 6 and July 8, 2020 (Washington law)).
Plaintiffs' brief: Resp. at 4–6 (citing *A.D.*, 885 F.3d at 1060 (Nevada law); *B.F. and A.A. v. Amazon.com, Inc., Report and Recommendation*, No. 19-cv-00910, ECF 78 p. 23, (W.D. Wash. Oct. 21, 2019) (Washington law)).

arbitration agreement. *See supra* Section II.A.1. But Amazon noted, and the Court agreed, that no difference existed between Washington and Illinois law regarding contract formation principles, so the Court did not engage in a choice-of-law analysis. *Id.* But it is axiomatic that equitable estoppel is evaluated under state law principles of *equity*, not contract law. *See Ill. Sch. Dist. Agency v. Pac. Ins. Co.*, 471 F.3d 714, 719 (7th Cir. 2006).

The Court has no basis for applying provisions of the COUs and TOUs without first deciding whether non-signatory E.G. has any rights under those contracts. Indeed, under an equitable estoppel analysis, Amazon's rights, if any, to compel arbitration as to E.G. do not arise under the COUs or TOUs themselves, but, as Amazon argues, state law principles of equity. As this Court has subject matter jurisdiction over this action under diversity jurisdiction, it applies state substantive law regarding enforcement of arbitration agreements by non-signatories. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938); *see also A.D.*, 885 F.3d at 1060 (applying Nevada law based on the agreement's choice-of-law provision because "the parties have not suggested that any other law is applicable"); *Tice v. Amazon.com, Inc.*, 2020 WL 1625782, at *2 (C.D. Cal. Mar. 25, 2020) (applying the law of the forum state when analyzing equitable estoppel argument).

However, the parties have not identified which state's law the Court should use to evaluate Amazon's equitable estoppel argument and have not engaged in a substantive choice-of-law analysis for the Court to make such a determination. *See Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 787 (N.D. Ill. 2020) ("Generally,

when a federal district court that is sitting in diversity or exercising supplemental jurisdiction has to decide which state's substantive law to apply, the court must apply the forum state's choice-of-law principles—in this case, Illinois. Illinois law, which applies the choice-of-law analysis from the Restatement (Second) of Conflict of Laws tells us that the law of the state with the most significant relationship to the occurrence and the parties applies in the event of a conflict. But the most significant relationship test does not come into play unless there is difference in law that would affect the outcome—absent such a disagreement, the law of the forum state applies.") (internal citations and quotations omitted). The parties must engage in a choice-of-law analysis specific to the equitable estoppel argument. Accordingly, the Court directs the parties to file supplemental briefs (i) containing a proper choice-of-law analysis and (ii) addressing equitable estoppel under the law of the resulting state.

## 2. Inherently Inseparable Claims

Next, also citing Washington law, Defendants posit that E.G.'s claims are inherently inseparable from those of her father, her legal representative, and therefore the Court may compel arbitration of E.G.'s claims. Memo. Compel at 8–9 (citing *Romney v. Franciscan Med. Grp.*, 349 P.3d 32, 42 (Wash. App. Ct. 2015); *Townsend*, 224 P.3d at 889). A reading of *Romney* and *Townsend* indicates that whether a non-signatory's claim in "inherently inseparable" from those her legal representative may be one of agency law, which is addressed below, *see infra* Section II.B.3, under Illinois law. *Romney*, 349 P.3d at 42 (holding that non-signatory employees were bound by the arbitration agreement, as "employees are agents of the

employer if the parties intended the agreement to apply to them or if the alleged liability arises out of the same misconduct alleged against the employer") (citation omitted). As discussed below, E.G. cannot be bound to Amazon's arbitration agreement under Illinois principles of agency.

Even if the "inherently inseparable argument" is distinct from agency principles, Amazon makes no argument as to why it applies to E.G.'s claims under Illinois law, nor does it engage in a choice-of-law analysis positing why the Court should apply Washington law. Regardless, the other basis under which courts bind non-signatories when their claims are inherently inseparable from those of a signatory are in parent-subsidiary relationships. *See Townsend*, 224 P.3d at 889 ("When the charges against a parent and subsidiary are based on the same facts, as is the case here, and are inherently inseparable, a court may order arbitration of claims against the parent even though the parent is not a party to the arbitration agreement."); *see also J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir. 1988) (same). To state the obvious, this case does not involve a parent-subsidiary situation, so E.G. cannot be bound by the arbitration agreement because her claims are inherently inseparable from those of Gunderson.

### 3. Agency

Last, the parties dispute whether Gunderson was E.G.'s agent, in purchasing and installing the Alexa device in their home, such that E.G. is bound to the arbitration provision. Here, both parties apply Illinois law.

In Illinois, the test to determine whether a principal-agent relationship exists is whether the alleged principal has the right to control the alleged agent, and whether the agent can affect the legal relationships of the principal. *Uesco Indus., Inc., v. Poohman of Wisc., Inc.*, 993 N.E. 97, 112 (Ill. App. Ct. 2013). Amazon insists that Gunderson, E.G.'s father and legal representative, acted as her agent in purchasing an Alexa device and installing it in their home. Memo. Compel Arb. at 8–10. Amazon relies on three out-of-jurisdiction cases in support of this proposition, all of which are distinguishable. *Chung v. StudentCity.com, Inc.*, 2013 WL 504757, *2 (D. Mass. Feb. 12, 2013); *Hofer v. Gap, Inc.*, 516 F. Supp. 2d 161 (D. Mass. 2007); *Adsit Co., Inc. v. Gustlin*, 874 N.E. 2d 1018 (Ind. Ct. App. 2007).

In *Chung*, the plaintiff's daughter purchased tickets to go on a student tour in Mexico, organized by Student City. 2013 WL 504757, at *2. The daughter made most of the payments for the trip with her own debit card but used her parents' debit card for one or two payments. *Id.* Each time she made a payment, she checked a box agreeing to Student City's customer agreement, which contained an arbitration clause. *Id.* The plaintiffs' daughter was injured on the trip and plaintiffs filed suit against Student City, who moved to compel arbitration. *Id.* at *1. Although plaintiffs had not signed the customer agreement, the court found that they were bound to the arbitration agreement because their daughter was their agent. *Id.* at *3–4. The court noted that plaintiffs authorized their daughter to make online payments using their debit card. *Id.* The court also pointed out that it was necessary to assent to the

customer agreement in order to make a payment on the defendant's website. *Id.* at *4.

In *Hofer*, the plaintiff's friend, with the plaintiff's consent, purchased airline tickets and booked accommodations for a trip for herself and the plaintiff via the Expedia website. 516 F. Supp. 2d at 166. In order for the plaintiff's friend to finalize the reservation she had to "click" through Expedia's terms and conditions, which included a liability disclaimer. *Id.* at 166–67. The plaintiff was injured on the trip and filed suit against Expedia, among others. *Id.* at 165. The district court granted Expedia summary judgment, finding that the plaintiff was bound by the liability disclaimer. *Id.* at 176. The court found that the plaintiff's friend was her agent, noting that the plaintiff authorized her friend to go online and purchase the airline tickets and hotel reservations. *Id.* at 175.

In *Adsit*, the defendant placed an order on the plaintiff's website for some seat covers. 874 N.E. 2d at 1021–22. There was a problem with the defendant's credit card, so her daughter-in-law, the co-defendant gave the defendant permission to provide the plaintiff with her credit card information to complete the purchase. *Id.* at 1022. The co-defendant had no other contact with the plaintiff. *Id.* The defendant subsequently returned the seat covers and co-defendant reversed the charges on her credit card. *Id.* Plaintiff filed suit against the defendants for breach of contract, claiming they never received the seat covers. *Id.* The co-defendant argued that since she did not place the order, she was not bound by the forum selection clause of the contract. *Id.* at 1023–24. The court disagreed, finding that co-defendant gave the

defendant her credit card information so the defendant could complete the purchase. *Id.* at 1024. As such, concluded the court, the co-defendant gave the defendant actual authority to engage in the transaction on her behalf. *Id.*

*Chung*, *Hofer*, and *Adsit* are all distinguishable from this case. In each of those cases, the non-signatory to the arbitration agreement, the liability disclaimer, or forum selection clause, assented to the transaction. Here, Amazon has not adduced any evidence that E.G., a three-year-old at the time the Complaint was filed, assented to the transaction. Indeed, Amazon does not point to any evidence in support of its contention that Gunderson was E.G.'s agent. In short, Amazon has not provided any evidence that a principle-agent relationship existed between Gunderson and E.G., much less that Gunderson was E.G.'s agent. Therefore, agency principles do not support Defendants' claim that E.G., as an undisputed non-signatory to the COUs or the TOUs, is bound by the arbitration agreement.

## Conclusion

For the reasons discussed above, the Court finds that Plaintiffs have adequately alleged injuries in fact for all of their BIPA claims such that there is Article III standing, and this Court has subject matter jurisdiction over the claims and can consider the merits of the case. The Court grants Defendants' Motion to Compel Arbitration [16] in part and denies it in part. The Court finds that Wilcosky's and Gunderson's claims are subject to arbitration. As such, Wilcosky's and Gunderson's claims are dismissed without prejudice to those Plaintiffs pursuing those claims in the appropriate forum. The Court denies the Motion to Compel

Arbitration as to Plaintiff E.G. without prejudice. As the movant, Amazon is directed to file a supplemental brief (i) containing a proper choice-of-law analysis related to its equitable estoppel argument and (ii) addressing equitable estoppel under the law of the resulting state by February 19, 2021. Plaintiffs are to file a response by March 5, 2021. No reply brief will be allowed absent a request to the Court. The briefs are limited to ten pages each. Additionally, the Court terminates Defendants' Motion to Dismiss [19] pursuant to Rules 12(b)(2) and 12(b)(6) without prejudice with leave to refile pending the Court's decision on Defendants' Motion to Compel Arbitration as to Plaintiff E.G. after review of the parties' supplemental briefs.

Dates: February 5, 2021

United States District Judge
Franklin U. Valderrama